**NO ARGUMENT SCHEDULED YET**

_____

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT
_____

Number 13-5210
_____

**THERESA ANN FOLEY**
**Plaintiff-Appellant**
**v.**
**ERIC H. HOLDER, ATTORNEY GENERAL, UNITED STATES**
**DEPARTMENT OF JUSTICE**
**Defendant-Appellee**
_____

APPEAL FROM A FINAL DECISION OF THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA
_____

CORRECTED BRIEF OF APPELLANT
_____

Mitchell J. Notis
Law Office of Mitchell J. Notis
32 Kent Street
Brookline, Massachusetts 02445
617-566-2700

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT

_____

Number 13-5210

_____

**THERESA ANN FOLEY**
**Plaintiff-Appellant**
**v.**
**ERIC H. HOLDER, ATTORNEY GENERAL, UNITED STATES DEPARTMENT**
**OF JUSTICE**
**Defendant-Appellee**
_____

APPELLANT'S CERTIFICATE OF COUNSEL AS TO PARTIES, RULINGS AND
RELATED CASES

_____

**A.  Parties**

Appellant is Theresa Ann Foley, who was Plaintiff in the District Court.

Appellee is Eric H. Holder, Attorney General, United States Department of

Justice, who was Defendant in the District Court.  There was no <u>amicus</u> <u>curiae</u>.

**B.  Ruling Under Review**

The ruling under review is the May 17, 2013 Order of Judge Royce C.

Lamberth, and the Memorandum Opinion upon which that Order was based,

granting Defendant's Motion for Summary Judgment and Denying Plaintiff's

Cross Motion for Partial Summary Judgment, and dismissing the case.  They

are found at Joint Appendix ("JA") 557-593.                                    i

## III.  Related Cases

This case has not previously been before this Court.  There are currently no pending related cases.

TABLE OF CONTENTS

Page

Certificate as to Parties, Rulings and Related Cases..............................i

Table of Contents............................................................................iii

Table of Authorities......................................................................iv

Jurisdictional Statement.................................................................1

Statement of Issues Presented for Review............................................. 1

Statement of the Case.................................................................... 2

Facts Relevant to Issues Presented for Review....................................  4

Summary of Argument................................................................. 17

Argument.................................................................................18

  Relevant Law.........................................................................20

Theresa Foley Had A Disability And Was Regarded As

Having A Disability..................................................................25

Conclusion...............................................................................30

Certificate of Compliance

Certificate of Service

TABLE OF AUTHORITIES

<u>Cases</u>                                                                                          Page

<u>Bragdon v. Abbott</u>, 524 U.S. 624, 118 S.Ct. 2196,

141 L.Ed.2d 540 (1988)…….………………………………………………24

<u>Doe v. Gates</u>, 828 F.Supp.2d 266 (D.D.C. 2011) …………….…………………20

<u>Duncan v. Harvey</u>, 479 F.Supp.2d 125 (D.D.C. 2007)………………………...20

<u>Kapche v. Holder</u>, 677 F.3d 454 (D.C. Cir. 2012)……….……………………24

<u>Singh v. George Washington U. School of Medicine and Health Sciences</u>,

508 F.3d 1097 (D.C. Cir. 2007)……………….………………………….…..23

<u>Skjorup v. Modern Door Corp.</u>, 153F.3d. 512 (7th Cir. 1998)…….………....23, 24

<u>Statutes</u>

28 U.S.C. section 1343……………………………………….………………1

42 U.S.C. section 2000e-16………………………………………………...1

29 U.S.C. section 791 et seq. ……………………………………………...1, 20

29 U.S.C. section 794a……………………………………………………..1

28 U.S.C. section 1291……………………………………………………..1

29 U.S.C. section 706(8)(b) ……………………………………………….21

ADA Amendments Act………………………..……………………………22

Americans With Disabilities Act……………………………………………19

Rehabilitation Act of 1973…………………………………………………….1, 20

Title VII of the Civil Rights Act of 1964…………………………………….....1

Regulations

29 C.F.R. section 1630.2(i) …..…………………………………………………...21

None of the cited authorities are chiefly relied upon.

**JURISDICTIONAL STATEMENT**

A.  The basis for the District Court's jurisdiction over this dispute was 28 U.S.C. section 1343 regarding civil rights claims, 42 U.S.C. section 2000e-16 regarding claims of gender discrimination under Title VII of the Civil Rights Act of 1964, and 29 U.S.C. sections 791 et seq. and 794a, regarding claims under the Rehabilitation Act of 1973.

B.  The  basis for the Court of Appeals' jurisdiction is 28 U.S.C. section 1291, regarding appeals from final judgments of district courts.  This is an appeal from a final decision of the District Court for the District of Columbia.  The decision under review was docketed on May 17, 2013. The Notice of Appeal in this action was filed on July 10, 2013.

C.    The decision under review was docketed on May 17, 2013. The Notice of Appeal in this action was filed on July 10, 2013.

D.  This appeal is from a final order or judgment which disposes of all parties' claims in the underlying action.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.  Was the decision of the District Court in error in failing to hold that Defendant-Appellee regarded Plaintiff-Appellant as disabled.

2.  Was the decision of the District Court in error in failing to hold that

Defendant-Appellee discriminated against Plaintiff-Appellant due to

regarding her as disabled.

3.  Was the decision of the District Court in error in holding that

Plaintiff-Appellant did not suffer from a disability.

4.  Was the decision of the District Court in error in failing to hold that

Defendant-Appellee failed to accommodate Plaintiff-Appellant's disability.

**STATEMENT OF THE CASE**

**Procedural History**

Ms. Foley's complaint in this action was originally filed in the U.S. District

Court for the District of Massachusetts on July 8, 2009.  In the complaint,

Ms. Foley alleged that she had been discriminated against due to her gender,

that she had been discriminated against due to a real or perceived disability,

and that she had been retaliated against for raising claims of gender and/or

disability discrimination.


On October 5, 2010, Chief Magistrate Judith Dein of the United States

District Court for the District of Massachusetts ordered the case transferred

from the District of Massachusetts to the District of Columbia.

The case was initially assigned to Judge Amy Jackson, and was later reassigned to Chief Judge Royce Lamberth. After the completion of discovery, Defendant-Appellee filed for summary judgment on all counts. Plaintiff opposed the motion, and filed a cross-motion for partial summary judgment.

By Order dated May 17, 2013, Chief Judge Lamberth denied the cross-motion for partial summary judgment, and granted the motion for summary judgment as to all counts.  That same date, Chief Judge Lamberth filed a 36 page Memorandum Opinion supporting the Order granting summary judgment.  The Memorandum Opinion was filed under seal.  The May 17, 2013 Order which was not filed under seal, stated that the Memorandum Opinion was to be filed under seal for ten days.  By ECF Notice dated March 6, 2014, the Memorandum Opinion was order unsealed. Joint Appendix ("JA") at 12.

Ms. Foley filed a timely appeal of Chief Judge Lamberth's decision on July 10, 2013.

On August 26, 2013, Appellee Holder filed a Motion for Summary Affirmance with this Court.  Appellant Foley opposed that Motion.

On January 10, 2014, this Court granted in part and denied in part the

Motion for Summary Affirmance.  Specifically, the Court granted summary

affirmance as to the gender discrimination claim and the retaliation claims

under Title VII and the Rehabilitation Act.   The motion was denied as to

"the claim of failure to provide reasonable accommodations."

**Rulings Presented for Review**

The ruling under review is the decision of Chief Judge Lamberth that

Appellant Foley did not suffer from a disability, and therefore that Ms. Foley

was not discriminated against due to a disability, and the failure of the

District Court to rule that Ms. Foley was regarded as disabled by her

employer, and was discriminated against on that basis.

**FACTS RELEVANT TO ISSUES PRESENTED FOR REVIEW**

Theresa Ann Foley was an FBI Special Agent.  She is a 48 year old female.

During 2003 and 2004, Ms. Foley was stationed with the FBI at the U.S.

Naval Base in Guantanamo Bay, Cuba, assigned to interrogate detainees at

Camp Delta.  Complaint par. 12.


Prior to being employed by the FBI, Ms. Foley had a successful career for

12 years with the Drug Enforcement Administration.  Complaint par. 13.

4

Ms. Foley was first employed by the FBI in January 2000.   In 2003, Ms.

Foley requested, and was granted, a one-year temporary duty assignment to

the detention facility for terrorists maintained by the U.S. Government at the

U.S. Naval Base at Guantanamo Bay Cuba.  Ms. Foley's assignment was to

be the interrogation of detainees in Camp Delta at Guantanamo.  Complaint

par. 14.


Ms. Foley first arrived at Guantanamo on October 7, 2003.  When she

arrived at Guantanamo, SA Foley was the first full-time female FBI Agent

assigned to Guantanamo.  Complaint par. 15.


The housing assigned to Ms. Foley upon her arrival at Guantanamo was

infested with vermin, specifically, large rats. As a result of the rat infestation

in her dwelling, Ms. Foley contracted the debilitating tropical disease

Leptospirosis.  Complaint at pars. 17, 22 and 24.  Ms. Foley was infected

with Leptospirosis almost immediately and had a multitude of symptoms

within days of her exposure.  Complaint at par. 24.


Ms. Foley's initial symptoms due to Leptospirosis consisted of bites all over

her body, breathing issues, swollen joints and muscles, fatigue, and

numerous other issues. Ms. Foley was exposed to Leptospirosis over a

number of weeks and months.  This exposure caused a weakening in her

immune system, and the leptospirosis bacteria affected her ability to

fight infection.  This caused breathing issues in her lungs and sinus cavities.

Additionally, Ms. Foley was treated for swollen muscles (particularly her

legs), was treated with steroids and received extensive physical therapy so

that the swelling would dissipate. Complaint par. 25.

Ms. Foley was diagnosed as suffering from Leprospirosis when she returned

to Boston for medical treatment in January 2004, after having sought

treatment at the U. S.  Naval Hospital at Guantanamo and at the Cleveland

Clinic in Ft. Lauderdale, Florida.    During January 2004, Ms. Foley's

diagnosing physician wrote in a letter describing her condition, that Ms.

Foley's illness (the Leptospirosis) interfered with her ability to work.

Complaint par. 26; see also JA at

After her diagnosis in January 2004, Ms. Foley returned to the U.S. Naval

Base at Guantanamo Bay, Cuba, and continued to serve there as a Special

Agent, although her medical and physical condition continued to deteriorate.

In particular, in the months after January 2004, Ms. Foley had increased

6

difficulty walking, kneeling and using her right leg, among other symptoms and difficulties.  During January 2004, Ms. Foley informed her managers and supervisors of her disability, her illness, Leptospirosis.  JA at 431 (par. 40); 445 (par. 119).

The senior FBI Officer at Guantanamo in 2003 and 2004 was Bradley G. Mendenhall.  Mr. Mendenhall's supervisor was in Washington, D.C.  In terms of the supervisory hierarchy at Guantanamo during this time, two supervisory Special Agents of the FBI reported directly to Mr. Mendenhall. They were Greg Ehrie and Michael LaPlante. JA at 442 (par. 104).

Mr. Mendenhall's opinion of the quality of Ms. Foley's work while she was at Guantanamo was that it was very good.  JA at 442 (par. 105).  Although the quality of Ms. Foley's work did not vary over the time she was at Guantanamo the volume of her work declined due to her medical treatments. Id.

Ms. Foley testified that when she went to Guantanamo she was in full form and did not have any disabilities, but as of November 2003, her legs were stiff and swollen, and her arms were stiff. JA at 443 (par. 110).  Ms. Foley

had congestion, horrible fatigue and stomach issues. Id.  Mr. Mendenhall's
general view of Ms. Foley's condition was that shortly after she arrived at
Guantanamo, her overall well-being started to decline and she started to
complain about not feeling well, being tired and run down and complaining
of pain in her legs. Id.

The general qualification for FBI agents for shooting was that they would
have to shoot quarterly.  JA at 444 (par. 114).  During the pistol qualification
course which was standard, agents would have to shoot from various
distances in the positions of laying prone, kneeling and standing up.  To pass
the pistol qualification an agent would have to receive a score of 80 or
better.  Id.  During the time Mr. Mendenhall was the Chief FBI supervisor at
Guantanamo, agents were not required to be armed while on duty.  Agents
were allowed to be armed while on duty, but this was discouraged.  Id.

To the best of their ability, FBI agents at Guantanamo in 2003 and 2004,
were required to attend firearms qualifications.  JA at 445 (par. 116).

Ms. Foley claimed in the Complaint that in March or April 2004 she had
been allowed the accommodation of being permitted to shoot during the

firearms qualification from a standing position rather than a kneeling or

prone position.  Complaint par. 30; see also JA at 450-452.  Ms. Foley had

requested this accommodation due to her limitations in bending her knees

and her legs.  Id.

Ms. Foley described her physical condition as follows:

"Later in March 2004, I attended the first FBI firearms qualification session.

Firearms qualifications were requested by SSAs Ehrie, LaPlante and

Mendenhall.  I was permitted to stand during firearms due to the fact I was

receiving physical therapy due to my damaged legs and the physicians had

stated that I should not bend the legs in particular the right one due to

Leptospirorsis.  The right one was more swollen due to the fact that I was

right dominant and walked with my right leg first, thus it got more use.

Physicians again reiterated I not bend the legs due to the swelling.  Firearms

qualification includes firing at a prone and kneeling position."

JA at 448.

                                        …

"I had been informed by orthopedic doctors as late as April 29, 2004, not to

bend my right leg or put pressure on it by kneeling or squatting.  I informed

SA Harrison of this and he agreed to modify the course somewhat so I could

qualify.  I just wanted to qualify.  Additionally, I had previously qualified

not kneeling at the first firearms qualification at GITMO in March, 2004.

…On May 14, 2004, I attended firearms qualification at GITMO.  I was

nervous for I was afraid to kneel due to the conditions of my legs, but was

also afraid due to the fact SSA Ehrie had noted a fitness for duty query if I

could not kneel."

JA at 449.


Ms. Foley further claimed in the complaint that in relation to a May 2004

firearms qualification, one of her supervisors threatened her with

questioning her fitness for duty if she took passed the firearms qualification

with an accommodation, that this was a threat to her continued employment

if she qualified with an accommodation, and that this was also a denial of the

accommodation she was requesting.  Complaint par. 32; see also JA at 454-

457.  As she was pressured, coerced and compelled to take the firearms

qualification without any modification or accommodation to her disability,

Ms. Foley attempted the firearms qualification without any modification, in

other words, she attempted to shoot from  kneeling and prone positions as

well as a standing position.  Complaint par. 34; see also JA at 458-460.  In

the course of attempting to shoot from the kneeling and prone positions, and

as a direct result of that attempt, Ms. Foley tore muscles in her right leg. Complaint par. 33-34; see also JA at 459-460. The leg muscle tear directly resulted in a much greater spread of the Leptospirosis, causing permanent injury to Ms. Foley's leg and other parts of her body. Complaint par. 35-36; see also JA at 459-460.

Shortly after the May 2004 firearms qualification and her injury while attempting to pass the qualification without accommodation, Ms. Foley left Guantanamo. Since July 2004, she has been unable to work, and has resided in her Mother's home in Boston, while being treated for her medical conditions. Complaint par. 37; see also JA at 466.

In the briefs submitted to the District Court, the parties differed on whether Ms. Foley was required or pressured to engage in firearms qualification, whether she requested and was denied an accommodation (with respect to the May 2004 firearms qualification), whether or not Ms. Foley completed the qualification, whether or not Ms. Foley passed the qualification, and whether or not Ms. Foley injured herself as a result of the qualification.

However, the District Court did not reach any of these issues, as the Court held that Ms. Foley was not disabled under the terms of the Rehabilitation Act. JA at 579.

Although the District Court explained in great detail its reasoning that Ms. Foley did not have an actual disability at the relevant time period on Guantanamo, JA at 579-586, **nowhere in the District Court's Memorandum Opinion, is there any discussion of whether Ms. Foley was deemed disabled under the Rehabilitation Act as she was "regarded as" disabled by her employer.**

The facts related to whether or not Ms. Foley was disabled, or was regarded as disabled, are set forth below.

As soon as Ms. Foley was diagnosed with Leptospirosis in early January 2004, she notified GTMO management. She called GTMO from her hospital in Boston. JA at 445 (par. 119). In the time that Theresa Foley was at Guantanamo, it was well known that she was having medical difficulties. Management at the facility including Mr. Mendenhall, Mr. Ehrie, Mr. LaPlante and firearms instructor Harrison, had discussions about whether or

not Ms. Foley could attend firearms qualifications, and whether it should be modified for her.  Mr. Mendenhall testified during his deposition as follows:

"Well, there was discussion because this was during a period of time when Theresa was going through her medical issues and there was, I think, a good deal of discussion between myself and Greg and Michael about – and Jim Harrison, about whether or not she could or should shoot.  It was also very common knowledge within the entire office what Theresa's medical issues were.

So there was a good deal of discussion about, you know, can she and should she or should she be allowed to attempt to shoot which was resolved in favor of yes, if she wants to shoot, she should be allowed to try.

　　　　…

It was very common knowledge among our entire staff the things that Theresa was dealing with.  … Well everybody in the office knew she was going through this.  Her diagnosis, which you know, ended up being the Leptospirosis diagnosis.  It was very common knowledge in the office that she was struggling through that issue medically."

JA at 445-446.

13

It was obvious to Mr. Mendenhall and others from their observations that Ms. Foley was having medical difficulties.  Mr. Mendenhall testified in his deposition as follows:

"Theresa was—on a daily basis, it was clear that she was in pain.  She complained a lot, you know, to us privately that her legs with really sore and she—you could tell when she walked that she was struggling.  So like I said, it was— …

Her condition and the issues she was dealing with were common knowledge to everybody on our staff.

Question: Did you know why—let me ask you this, was her gait-did her gait appear notable?

Answer:      I think it did.

Question:  Okay, do you remember in what way?

Answer:  I think she kind of—she walked very slowly.  I am not sure if I remember if she had a limp or not, but it was—even if I didn't know what she was going through, it would have been clear that she was hurting.

                …

Question:      Is it fair to say it was known that something was wrong, but it wasn't known what it was?

14

Answer:  I think that is probably accurate for that late Spring early Summer

2004, but I can't be sure of what—where she was in that—

Question:     Do you know?

Answer:  Continuum"

JA at 446-447.


Mr. Mendenhall testified that Ms. Foley's deteriorating condition was

known to everyone and that he discussed this in his management meetings

with Mr. LaPlante and Mr. Ehrie.  Mr. Mendenhall testified as follows:


"My personal observation was in early 2004, you know, through, you know,

the Spring of 2004, it was noticeable to me and everyone that her physical

condition was deteriorating.

Question:  Did you ever discuss that in your meetings with LaPlante and

Ehrie.

Answer:  Sure.

Question:  What was said?

Answer:  I mean, it was always that her situation, and how, you know, we

were going to support her in dealing with it and going off the island for her

treatments and those sort of things were something we talked about

frequently.  Theresa talked to us about it frequently.  But specifically, I

cannot remember what we talked."

JA at 447 (part. 122).


Mendenhall had repeated conversations with his staff, Mr. Ehrie and Mr.

LaPlante about Ms. Foley's health condition as they were concerned for her.

JA at 447 (par. 123).


Mr. Mendenhall stated in an affidavit that Ms. Foley went to the hospital at

Guantanamo approximately 35 times. JA at 447 (par. 124).


With regard to Ms. Foley's physical difficulties and his observation of them,

a second supervisor, Supervisor Ehrie, testified that occasionally Ms. Foley

would appear very tired and groggy.  JA at 448 (par. 125). In an Affidavit

dated May 4, 2007, Mr. Ehrie stated that he had many conversations with

Ms. Foley about her illness. JA at 448 (par. 1260.  He also stated that in

approximately March, 2004, he discussed with Ms. Foley the fact that she

was physically getting worse and that he inquired on an almost daily basis

about her health.  Id. At Page 13 of his Affidavit, Mr. Ehrie stated the

following:  "When SA Foley was assigned to GITMO she confided in me

and I gave her preferential treatment because of her illness." JA at 461 (par. 165).

## SUMMARY OF ARGUMENT

The District Court did not reach various disputed issues related to Ms. Foley's claims of failure to accommodate a disability or discriminatory adverse action due to animus based upon perceived disability. The District Court reached this result as it found that Ms. Foley did not have a "disability" as defined by the Rehabilitation Act, and as (for unexplained reasons) the District Court failed to discuss or analyze the "regarded as disabled" claim.

Based upon the testimony of two FBI supervisors about their observations of Ms. Foley and their statements regarding her physical condition, and the testimony of Ms. Foley, it is clear that Ms. Foley was substantially limited in the "adl" (activity of daily life) of walking. As Ms. Foley was also substantially limited in her ability to engage in a firearms qualification, this, combined with her walking restriction, made her significantly restricted in her ability to perform a class of jobs or a broad range of jobs in various classes (armed law enforcement). Therefore, Ms. Foley was substantially limited in the "adl" or working.

17

Due to her restrictions in walking and working, Ms. Foley had an actual disability, which the FBI was required (but failed) to accommodate.

Also based upon the testimony of the two supervisors and Ms. Foley, it is clear that the FBI was aware of Ms. Foley's impairment, and believed that she was substantially limited in her ability to walk or to work.  Due to this belief and animus accompanying this belief, Ms. Foley was required to take a firearms test under conditions which it was known would cause her to either injure herself or fail the test. As a result, Ms. Foley both failed the test and was severely injured.

As the District Court committed clear error of law in finding that Ms. Foley did not have a disability, and in not ruling on her claim of being "regarded as" disabled, the District Court's grant of summary judgment must be reversed, and this case remanded for trial.

**ARGUMENT**

Ms. Foley presented the District Court with a two-fold argument regarding being discriminated against due to a real or perceived disability, in opposing the government's motion for summary judgment.

First, Ms. Foley argued that as her employer "regarded" her as a person with a disability, and due to that belief that she had a disability, she was required

to engage in firearms qualification from shooting positions which her employer <u>knew</u> would either cause her to <u>fail</u> the qualification, or <u>injure herself</u>.  Both came true.  Ms. Foley both failed and severely injured herself.

Second, Ms. Foley argued that she had an actual disability, and therefore that the FBI failed to make a reasonable accommodation to her disability, namely, letting her shoot from a standing position only.  The District Court did not reach either of these arguments.

The District Court held that at the specific time of the incidents at Guantanamo, Ms. Foley did not have a disability as that term is defined in the Americans With Disabilities Act.  Accordingly, the Court ruled that the FBI did not legally fail to accommodate any disability as to Ms. Foley.

As to the second basis for claiming that she was a person with a disability as that term is defined in the Americans With Disabilities Act, namely that she was "regarded as" a person with a disability, the District Court failed to either analyze or discuss this theory.

19

In light of this Court's summary affirmance of the District Court's ruling on the gender discrimination and retaliation claims, and the manner in which the District Court dealt with the disability discrimination claims (not reaching the issues of either whether an adverse action was taken against Ms. Foley based upon discriminatory animus, or whether there was a failure to accommodate, JA at 579), the central issue before this Court is whether or not Ms. Foley either had a disability or was regarded as having a disability, at the time she was required to undergo firearms qualification in 2004.

Relevant Law

The Rehabilitation Act, 29 U.S.C. section 791 et seq., provides remedies to federal employees who have been discriminated against due to their disabilities, and requires agencies to grant reasonable accommodations to disabled employees.  In order to qualify for protection under the Act, an employee must show that they meet the definition of "disabled" under the Act, that they were qualified for their position, and that they suffered an adverse action due to their disability.  See, e.g., Doe v. Gates, 828 F. Supp.2d 266, 270 (D.D.C. 2011) (citing Duncan v. Harvey, 479 F.Supp.2d 125, 129-130 (D.D.C. 2007)).

20

To establish a disability under the Rehabilitation Act, a claimant must prove either: 1) physical or mental impairment which substantially limits one or more major life activities, or; 2) a record of such impairment, or; 3) being regarded as having such impairment.  See 29 U.S.C. section 706(8)(b). Major life activities include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.  See 29 C.F.R. section 1630.2(i).

In terms of an alleged failure to accommodate a disability, the standard set forth by the District Court was the following:

> "In a failure to accommodate case, a plaintiff must show "1) she has a disability within the meaning of the statute; 2) the defendant had notice of her disability; 3) she could perform the essential functions of the employment position with or without reasonable accommodation; and 4) the defendant refused to make the accommodation.  Bonnette, 2012 WL 5986466 at *17."

The issue of Ms. Foley being "regarded as" disabled, was raised below by Ms. Foley in her Opposition to Appellee's Motion for Summary Judgment, 16-19.  See also JA at 445 -450.

21

As the District Court explained, the Rehabilitation Act incorporates the Americans With Disabilities Act definition of a person with a disability. JA at 580. Although Congress enacted the ADA Amendments Act (ADAAA) in 2008 to broaden the scope of the definition of "disability" and to "reject" prior judicial interpretations of the definition of "disability," the ADA Amendments were not retroactive. The Court correctly held that the law to apply to Ms. Foley's claims was the pre-ADAAA definition of "disability." The District Court set forth the standard at issue: "Under the pre-Amendments ADA, an individual was disabled if she had "a physical or mental impairment that *substantially limit[ed]* one or more of the major life activities [MLAs] of [the] individual," had " a record of such an impairment," or was " regarded as having such an impairment." JA at 581. The District Court later stressed that it was not adequate for the establishment of a disability to prove that an individual "merely" has a disability, but that "Claimants also need to demonstrate that the impairment limits a major life activity." JA at 581-582. The Court also noted that a restriction would qualify as "severe" if it limited the impaired individual "in the context of what most people do in their daily lives." Id. In terms of the arguments made below by Ms. Foley, the District Court assumed "without deciding" that activities such as kneeling, laying prone, bending her arms

22

and legs and walking" were major life activities. JA at 580. With regard to the major life activity of working, the District Court stated that " a plaintiff must show that she was significantly restricted in her ability to perform a class of jobs or a broad range of jobs in various classes." JA at 583.

In Singh v. George Washington U. School of Medicine and Health Sciences, 508 F. 3d 1097, 1100-1102 (D.C. Cir. 2007), this Court instructed that whether an impairment "severely restricts" a person in the activities of daily life, is determined by comparison to "most people," in other words, the average person.

The second basis asserted by Ms. Foley for her claim that she suffered from a disability, is that the FBI "regarded" her as having a disability. The standard is somewhat different than that for an "actual" disability. In its Reply Brief in support of its Motion for Summary Affirmance in this Court, the FBI correctly set forth the standard for a federal employee claiming to be "regarded as" disabled. At page 7 of the Reply Brief, the FBI stated the following:

"A plaintiff seeking to show she was regarded as disabled must show more than mere supervisor awareness of an illness. See, e.g., Skjorup v.

Modern Door Corp., 153 F. 3d 512, 515 (7th Cir. 1998) (explaining "[i]t is not enough for [the plaintiff] to show that [the employer] was aware of her impairment; instead [the plaintiff] must show that [the employer] knew of the impairment and believed that she was substantially limited because of it").

This Court discussed these standards in Kapche v. Holder, 677 F. 3d 454, 461 (D.C. Cir. 2012), in a case decided after the ADAAA but dealing with allegedly discriminatory actions occurring prior to 2008. The Court stated that the determination of whether an individual is substantially limited in a major life activity is an individualized inquiry. The Court reiterated that in order to show that her limitation was substantial compared to the average person in the general population, "an impairment need not cause an utter inability to perform a major life activity in order for it to constitute a substantial limitation. Bragdon v. Abbott, 524 U.S. 624, 641, 118 S. Ct. 2196, 141 L.Ed.2d 540 (1998)."


The first question to be answered in this case, is whether a reasonable jury could find that Ms. Foley indeed suffered from an actual disability. The second, separate question, is whether a reasonable jury could find that Ms. Foley's employer knew of her impairment, and believed based upon that

impairment, that she was substantially limited in a major life activity due to that impairment.  The answer to both questions is "yes," and on that basis, the decision of the District Court granting summary judgment to the FBI must be overturned, and this matter sent back to the District Court for trial.

Theresa Foley Had A Disability and was Regarded as Having a Disability

Ms. Foley testified that as soon as she was diagnosed with Leptospirosis in January 2004, she informed FBI Management at Guantanamo of that diagnosis.  Indeed, she called FBI Management in Guantanamo from her hospital in Boston.  Ms. Foley was very open in discussing her illness with her supervisors during her remaining time on Guantanamo.

As is discussed above, the senior FBI Manager at Guantanamo while Ms. Foley was stationed there, was Bradley Mendenhall.  With regard to Ms. Foley's physical condition, Mr. Mendenhall has testified as follows:

--There was much discussion involving Mr. Mendenhall and other FBI management officials, about whether Ms. Foley would be allowed to engage in firearms qualifications.  This was "when Theresa was going through her medical issues…it was very common knowledge within the entire office what Theresa's medical issues were."

25

--It was common knowledge what Theresa Foley was going through.  "It was very common knowledge in the office that she was struggling through that issue medically."

--It was clear to Mr. Mendenhall and others that Theresa Foley was having medical difficulties.  "…on a daily basis, it was clear that she was in pain."

--"…you could tell when she walked that she was struggling."

--"Her condition and the issues she was dealing with were common knowledge to everybody on our staff."

--Ms. Foley's gait was notable.  "…she walked very slowly…even if I didn't know what she was going through, it would have been clear that she was hurting…"

--It would have been known that something was wrong with Ms. Foley.

--In early 2004 through Spring 2004, it was noticeable to Mr. Mendenhall "and everyone" that Theresa Foley's physical condition was deteriorating. Mr. Mendenhall frequently discussed Ms. Foley's medical condition with his staff.  Ms. Foley frequently discussed her medical condition with Mr. Mendenhall and his staff.

--Mr. Mendenhall knew that Theresa Foley had been to the hospital at Guantanamo approximately 35 times.

26

Another FBI supervisor, Mr. Ehrie, testified that occasionally, Ms. Foley would appear very tired and groggy.  Mr. Ehrie also stated that he had many conversations with Theresa Foley about her illness, and that in approximately March 2004, he discussed with her the fact that she was physically getting worse.  Supervisor Ehrie testified that he inquired on an almost daily basis about Theresa Foley's health.  Perhaps most importantly, Supervisor Ehrie testified that Theresa Foley confided in him, and he gave her preferential treatment due to her illness.

Based upon the facts set forth above, Ms. Foley's FBI supervisors knew of her impairment, her disability and its symptoms.  Based upon the testimony of Supervisors Mendenhall and Ehrie, and Ms. Foley's testimony (including a description of her limitations as well as her statement of the advice provided by her physicians), Ms. Foley had an actual disability.  Ms. Foley was substantially limited and significantly restricted in the ADL's (activities of daily living) of walking, and working.

Ms. Foley had great difficulty walking, she walked only with pain, she suffered while walking, she had an obvious gait problem while walking due to her difficulties, she walked very slowly, she was hurting while she

27

walked, and it was known that her physical condition was deteriorating.  Ms.

Foley's physicians had instructed her not to bend her right leg or put

pressure on it.  Ms. Foley at times appeared groggy and tired, and had been

to the hospital approximately 35 times.


Ms. Foley had an actual disability due to her significant restriction in

walking.

Similarly, there was mush doubt expressed by Ms. Foley's superiors about

her ability to take a firearms qualification, doubt about her ability to take a

test regarding her ability to shoot a weapon.

When the significant restriction regarding walking is combined with the

inability to take a firearms qualification test, it is clear that Ms. Foley was

also significantly restricted in her ability to perform a class of jobs or a

broad range of jobs in various classes, namely, armed law enforcement.

Ms. Foley had an actual disability due to her significant restriction in

working.


Theresa Foley had an actual disability, she could have performed the

essential duties of her position with an accommodation, the accommodation

was requested but denied, and as a result, Ms. Foley was severely injured.

Similarly, Ms. Foley's supervisors knew of her impairment, and based upon the cited testimony, clearly believed that Ms. Foley was significantly restricted in her ability to walk, or to work (as an armed law enforcement officer).

Ms. Foley was regarded as a person with a disability, as a result of being regarded as a person with a disability (and animus due to that belief) she was required to take a test under circumstances which were known would cause her to either fail the test or injure herself, and as a result, she did injure herself and fail the test.

The FBI failed to make a reasonable accommodation to Ms. Foley's disability.

The FBI discriminated against Ms. Foley due to its belief that she suffred from a disability.

As Ms. Foley had an actual disability and additionally, as Ms. Foley was regarded by the FBI as a person with a disability, the summary judgment which was granted on the issue of disability discrimination and failure to accommodate  disability was clearly an error of law, and must be reversed.

.

29

## **CONCLUSION**

For all of the foregoing reasons, it is respectfully requested that the Order

granting summary judgment to the Defendant-Appellee as to Ms. Foley's

claims of disability discrimination and failure to accommodate a disability,

be reversed, and that these issues be remanded to the District Court for trial.


Respectfully submitted,
Theresa Ann Foley
By her Attorney,

/s/ Mitchell J. Notis
_____
Mitchell J. Notis, BBO# 374360
LAW OFFICE OF MITCHELL J. NOTIS
32 KENT Street
Brookline, MA 02445
Tel.: 617-566-2700

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type volume limitations FRAP 32(a)(7)(b) because the brief contains 5666 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(b)(iii).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because the brief has been prepared in a proportionately spaced typeface using Microsoft Word V.X. in 14 point font in Times New Roman.


/s/ Mitchell J. Notis

_____
Mitchell J. Notis
Attorney for Plaintiff-Appellant



Dated: 3/12/14

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT

_____

Number 13-5210

_____

**THERESA ANN FOLEY**
**Plaintiff-Appellant**

**v.**

**ERIC H. HOLDER, ATTORNEY GENERAL, UNITED STATES**
**DEPARTMENT OF JUSTICE**
**Defendant-Appellee**

_____

CERTIFICATE OF SERVICE

_____

     I, Mitchell J. Notis, counsel to Plaintiff-Appellant, hereby certify that

on March 12, 2014, I caused the foregoing Corrected Brief of Appellant to

be served on counsel for all other parties to this action, through the Court's

ecf system, to Benton Peterson, Esq., through his email address of

benton.peterson@usdoj.gov.

/s/ Mitchell J. Notis
_____

Mitchell J. Notis
LAW OFFICE OF MITCHELL J. NOTIS
32 KENT Street
Brookline, MA 02445
Tel.: 617-566-2700